**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF VIRGINIA**
**HARRISONBURG DIVISION**

| | | |
|---|---|---|
| **IN RE:** | : | **Case No.** 15-50054 |
| | : | |
| **SHENANDOAH FAMILY FARMS** | : | **Chapter 11** |
| **COOPERATIVE, INC., et al.** | : | **(Jointly Administered)** |
| | : | |
| | : | **Judge Rebecca B. Connelly** |

_____

**DECLARATION OF EDWARD W. SHOWALTER IN SUPPORT OF THE DEBTORS'**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**
_____

1. I am the Chairman of the Board of Directors of Shenandoah Family Farms Cooperative, Inc. ("Coop"), a Virginia agricultural cooperative corporation headquartered in Rockingham County, Virginia. I am familiar with the history, past day-to-day operations, businesses and financial affairs of the company and its affiliates Hagerstown 1100 Frederick, LLC (''1100") and Valley Pride, LLC ("Pride"), which are the Debtors in their respective Chapter 11 cases to be filed in the near future.

2. I submit this declaration (the "Declaration") (i) in support of the petitions (the "Petitions") of the Debtors for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), (ii) pursuant to 28 U.S.C. § 1746 in support of the Debtors' petitions and contemporaneously-filed requests for relief in the form of motions and applications (the "First Day Motions") and (iii) to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of these Chapter 11 cases. I personally have reviewed all of the First Day Motions, and it is my belief that the relief sought therein is essential to the uninterrupted stabilization of the Debtors' assets and business affairs and to the Debtors' efforts to reorganize or preserve and properly dispose of its assets in these bankruptcy cases.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my

personal knowledge, my review of relevant documents, information provided to me by employees working under the supervision of the governing body of the Coop or by other Coop directors, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors and the dairy industry as a whole. If called upon to testify, I would testify competently to the facts set forth in this Declaration. Unless otherwise indicated, any financial information contained herein is unaudited and provided on a consolidated basis.

## Commencement of Reorganization Proceedings

4. On January 26, 2015 (the "Petition Date"), each of the "Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. **I would note at the outset that the milk processing plant described below has ceased operations as a production facility, and that the Debtors do not seek to reopen the facility except as a result of a restructuring that might occur through bankruptcy.**

5. Part I of this declaration describes the Debtors' businesses, Part II and III describe the circumstances giving rise to the commencement of these Chapter 11 cases and Part IV describes the First Day Motions.

### *I. The Debtors' Businesses*

6. The Debtor 1100 is the fee simple owner of approximately 11.6 acres located in Hagerstown, Maryland, improved by an industrial building containing approximately 142,000 square feet (the "Plant"). The Plant is approximately 30 years old and prior to its purchase by 1100 it was operated by Unilever as a novelty ice cream manufacturing plant.

7. The Plant was subsequently purchased by 1100 when 1100 was owned by other parties. 1100 as an entity was bought by Pride in August, 2013 and 1100 has remained the owner of the Plant to the present time.

8. Pride was chartered in 2012 for the sole purpose of acquiring a milk processing plant and originally negotiated to acquire another facility and not the Plant. When it had the opportunity to acquire the Plant, which it deemed a better site, it did so indirectly by purchasing the entire ownership and member interest of 1100 and that has been Pride's sole activity since August, 2013. Pride used loan funds from The First Bank and Trust Company and over $2,500,000 of capital contributions from its owners for the purchase money of 1100. At that same time, equity capital contributed by Pride's members in the amount of $1,750,000 was loaned to Coop by Pride, reflected in an unsecured demand note for that amount.

9. Coop was chartered in July, 2013 as the operating company for the Plant and has operated the Plant as its sole business endeavor since Pride acquired 1100 the following month. Coop operated a fluid milk product line that consisted of whole milk, 2% milk, skim milk, chocolate milk, half & half, and seasonal eggnog; a soft serve ice cream line that consisted of vanilla and chocolate; and a hard ice cream line which consisted of butter pecan, chocolate, vanilla, and strawberry. During full operation, Coop employed 44 people at the facility.

10. Pride is owned by 21 dairy farmers (individuals or farm companies) in Rockingham and Augusta County, Virginia. (Pride's charter was cancelled by the Virginia State Corporation Commission in 2014 under the automated process used when an limited liability company fails to timely pay its annual franchise fee. Thus the members currently act as trustees in dissolution, but the franchise fee has been paid recently and the LLC will be reinstated as permitted by law.) Pride is the sole owner of 1100. Coop is owned by those same 21 farmers or farm companies as Pride, plus fourteen other dairy farmers from the same locale, who own preferred shares rather than common shares. I am authorized to act for all three companies in these bankruptcy cases.

11. The Debtors will file the First Day Motions concurrently with the filing of their Chapter 11 petitions or soon afterward. The Debtors will request that each of the First Day Motions be granted, as each constitutes a critical element in achieving a successful and smooth transition to Chapter 11.

12. For a more detailed description of the First Day Motions than set forth below, the Debtors respectfully refer the Court to the respective First Day Motions. To the extent that this Declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control. Capitalized terms that are used herein shall be as defined in the First Day Motions, but if any capitalized term is not defined therein and is used herein, or if there is a conflict in the definitions between the First Day Motions and this Declaration, this Declaration shall control.

## *II. Events Leading up to Chapter 11*

13. There were large cost overruns with the initial Plant modifications and equipment purchases in the general range of $2,000,000. Operations were delayed by about two months compared to the business plan, yielding a period without any operating revenue. Fixed operating costs for the Plant exceeded the projected amount; projected sales revenue and margin pricing were not attainable in the market. Initial management was unable to effectively address the operational needs and problems that developed. In May, 2014 the operations were managed on an *ad hoc* basis during a search period for a new general manager. In August, 2014 a senior management team arrived that was able to provide the experience and skills to effectively manage the business, but by that time the financial picture was dire.

## *III. Prepetition Restructuring Efforts*

14. From the time of the acquisition in August, 2013 through the arrival of the new management team, the business had sustained continuous operating losses. Those shortfalls were covered by capital infusions from farmer-owners and private investors, and by loans made by The First Bank and Trust Company. Within two months after the arrival of the new management team in mid-summer of 2014, an analysis of the business model confirmed the obvious – there were serious flaws in the business plan. A series of changes were pursued. For example, efforts to add a co-packing line or a joint venture partnership to more fully utilize the Plant capacity were undertaken but unsuccessful. As losses reduced operating cash below a sustainable level, on December 19, 2014 the Plant was shut

4

down for a few days, but then the course was reversed. There were leadership changes at the Board of Directors level, a highly-experienced advisory panel was recruited and the Plant was reopened to permit exploration of possible opportunities that had developed. Those possibilities did not materialize, and the decision was made to terminate operations on January 19, 2015.

### *IV. First Day Motions*

#### Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases

26. The Debtors seek entry of an order directing joint administration of these cases for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule l015-1 of the Local Rules of the United States Bankruptcy Court for the Western District of Virginia (the "Local Bankruptcy Rules"). Specifically, the Debtors request that the Court maintain one file and one docket for all of the Chapter cases under the lead case, Coop. Further, the Debtors request that an entry be made on the docket of each of the Chapter 11 cases of the Debtors to indicate the joint administration of the estates.

#### Debtors' Motion for Entry of an Order Authorizing Financial Institutions to Honor and Process Outstanding Checks

32. The Debtors seek entry of an order authorizing, but not directing them, to provide for outstanding checks to be paid when presented on the existing pre-petition accounts, rather than replacing those checks with substitute checks drawn on the debtor in possession accounts.

33. I believe that the relief requested in the motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes an important element in achieving a successful and smooth transition to Chapter 11 and avoiding unnecessary paperwork. Accordingly, on behalf of the Debtors, I respectfully submit that the motion should be granted.

#### Motion for Entry of Order Providing for the Retention Of Key Employees Effective *Nunc Pro Tunc* to the Petition Date

34. The Debtors seek entry of an order authorizing the appointment of two senior

managers, one office clerk, one human resources employee, two sales representatives and certain technicians and warehousemen as described in the motion. The tasks needed to achieve to stabilize the Plant, market remaining inventory, collect accounts receivable and support all other efforts of the Debtors to achieve their goals in these Cases have been developed by the Coop's general manager, who is very experienced in the industry, and have been carefully considered in developing the retention schedule and incentive bonuses set forth in the motion. The general outline of the schedule have been discussed with and approved by The First Bank and Trust Company in developing the budget referenced in the Debtors' motion for authority for post-petition financing and to use cash collateral.

35.   I believe that the relief requested in the retention motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the retention motion should be granted.

<u>Debtors' Motion for Entry of an Order Authorizing (i) Debtors to Pay
Prepetition Wages, Salaries, Employee Benefits and Other
Compensation and (ii) Financial Institutions to Honor and Process
Related Checks and Transfers</u>

36.   The Debtors seek entry of an order (a) authorizing, but not requiring, them to pay or cause to be paid, in their sole discretion, all or a portion of the amounts owing (and associated costs) under or related to wages and the withholding obligations and (b) authorizing applicable banks and other financial institutions to receive, process and pay any and all checks drawn on the Debtors' payroll accounts and automatic payroll and other transfers to the extent that those checks or transfers relate to any of the foregoing.

37.   If the requested relief is not granted, the Debtors' relationships with their remaining employees would be adversely impacted and there could well be irreparable harm to the employees' morale, dedication, confidence and cooperation. As noted above, the remaining employees are all key

people and needed for these Cases. At this early stage, the Debtors simply cannot risk the substantial damage to their goals in these Cases that would inevitably attend any decline in morale attributable to the Debtors' failure to pay wages, salaries, benefits and other similar items.

38. I believe that the relief requested in this motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the motion should be granted.

### Debtor's Motion for Entry of an Order (i) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (ii) Deeming Utility Companies Adequately Assured of Future Performance

39. The Debtors seek entry of an order determining that the Debtors' proposed offer of arrangements with Utilities provides Utilities with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, and prohibiting the Utilities from altering, refusing or discontinuing any Utility Services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance.

40. Uninterrupted Utility Services are essential to the Debtors' ongoing operations. Should any Utility refuse or discontinue service, even for a brief period, the Debtors' operations could be severely disrupted. The impact of this disruption on the Debtors' day-to-day business operations and revenue would be extremely harmful and could jeopardize the value of the Debtors' assets.

41. I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that this motion should be granted.

### Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(d)(2), 364(d)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection To Prepetition Secured Creditors Pursuant

To 11 U.S.C. §§ 361, 362, 363 And 364 And (III) Scheduling Final Hearing Pursuant To Bankruptcy Rules 4001(B) And (C)

49. The Debtors request entry of an interim and a final order authorizing the Debtors to obtain post-Petition financing and to utilize cash collateral based on the terms contained in the proposed interim order attached to the DIP financing motion, and specifically including disbursements set forth in the budget attached to the memorandum of understanding that is attached as Exhibit B to the DIP financing motion. In short, the only other source of funds remotely possible for the Debtors would have been the farmer-owners themselves, and their resources had been tapped substantially before the need for post-petition financing occurred.

50. For reasons explained in the motion, the Debtors are not a candidates for an institutional, outside loan at a reasonable interest rate. The Bank is willing to fund the costs, after application of account revenues, to finish placing the Plant in a dormant status, which will allow either a sale in a controlled process through bankruptcy, or a restructuring based on a change of majority ownership and control. The financing terms offered by the Bank are very favorable, reflecting its interest in maximizing the proceeds of its collateral or a restructuring to permit payment of its claims.

51. The DIP financing arrangements will address the Debtors' liquidity needs, enable the Debtors to preserve their value as a going concern and provide the Debtors the opportunity to consummate a restructuring transaction that will maximize recoveries to all parties in interest, whether in the form of a plan of reorganization or a sale.

52. Importantly, the terms of the DIP financing arrangement are fair and reasonable. I believe the Debtors' request to approve this motion should be granted for three reasons. First, it contains the best available terms available to the Debtors – in fact, the terms are extremely favorable. Second, it provides the Debtors with substantial liquidity required to properly preserve the value of assets. Third, no prospective DIP lenders would fund on a junior basis or unsecured basis.

53. I believe that the process undertaken by the Debtors was reasonable and it produced the

best available financing option given the circumstances.

54. The Debtors greatly need the liquidity offered by the DIP financing arrangements in order to resume operations. Those arrangements will also send a strong signal to the remaining employees, whose services are key to maximizing asset value for the benefit of creditors, and other parties of the Debtors' intent to continue operating in Chapter11 and consummate a value-maximizing transaction for the benefit of their estates and creditors. Accordingly, if approved, it will preserve and enhance the value of the Debtors' businesses and, as such, is in the best interests of the Debtors' estates and creditors.

## IV. Conclusion

55. I respectfully request that all of the relief requested in the First Day Motions, and such other further relief as may be just and proper, be granted.

56. I, the undersigned Chairman of the Board of Coop, declare and affirm under penalty of perjury that the foregoing is true and correct.

/S/ Edward W. Showalter
EDWARD W. SHOWALTER

**Dated: January 25, 2015**

By: /S/ Dale A. Davenport
Dale A. Davenport, Esquire (VSB #016268)
*ddavenport@hooverpenrod.com*
Hannah W. Hutman, Esquire (VSB#79635)
*hhutman@hooverpenrod.com*
Beth C. Driver (VSB#83838)
*bdriver@hooverpenrod.com*
HOOVER PENROD PLC
342 South Main Street
Harrisonburg, Virginia 22801
540/433-2444
540/433-3916 (Facsimile)
Proposed Counsel for the Debtors/Movants